# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CC-01286-SCT

*MISSISSIPPI TRANSPORTATION COMMISSION*

*v.*

*GARY B. ANSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/22/2002 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RICHARD E. WILBOURN, III |
| ATTORNEY FOR APPELLEE: | WILLIAM L. DUCKER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 06/03/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    The Mississippi Department of Transportation (MDOT)[1] terminated Gary B. Anson's employment following an investigation of complaints brought against him by two MDOT employees. Anson appealed to the Employee Appeals Board (EAB) where the hearing officer ordered reinstatement, but with stipulations Anson found unacceptable. Both Anson and MDOT appealed to the full EAB which overruled the hearing officer and affirmed Anson's termination. The Forrest County Circuit Court reversed the EAB decision, finding it unsupported by substantial evidence, arbitrary and capricious, violative of constitutional

---

[1] MDOT is the operating entity of the Mississippi Transportation Commission which is the named appellant presently before this Court.

rights, and beyond the scope of the power granted the agency.  We disagree, and we reverse and render.

**FACTS**

¶2.	Anson had been an MDOT employee for approximately nine years, and at the time of his termination was an Engineer Technician I.   Two fellow MDOT employees filed formal complaints against Anson: Connie Dobson filed regarding two separate incidents and  Doris Davis filed regarding a third incident.  The subsequent MDOT investigation culminated in a finding that Anson had committed six group three offenses as defined in the Mississippi State Employee Handbook[2], and on January 17, 2001, he was suspended with pay pending the pre-disciplinary conference and subsequent hearings.  The following day, after receiving complaints from MDOT employees that they were uncomfortable about talking to  Anson, who was calling them during work hours asking them for information, the employees at the District Six Lab were sent an interdepartmental memo informing them "not to have any communication with [Anson], or to give out any information to him that might be detrimental to the MDOT."

¶3.	In Anson's written answer to the pre-disciplinary action notice, he admitted to calling Dobson's home about issues related to work and to using "bad language." At Anson's hearing, however, he asserted that the phone conversations were not work related.  Anson also denied Davis's allegations although he admitted pointing his finger at Davis and warning her to "stay out of his business."

---

[2] The Group 3 offenses cited in Anson's disciplinary action notice were: "[t]hreatening or coercing employees, supervisors, or business invitees of a state agency or office, including stalking; and [a]n act or acts of conduct occurring on or off the job which are plainly related to job performance and are of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to the public or to other state employees."  The investigation revealed that both offenses occurred in each of the 3 complaints filed against Anson.

¶4. Following receipt of the notice of his termination, Anson timely appealed to the EAB, and hearing officer William H. Smith, III, was designated to hear the appeal. On two separate days, Smith heard testimony from sixteen witnesses. MDOT called the complainants, Davis and Dobson, and Dobson's husband, as well as the MDOT manager of discipline, and the MDOT district personnel manager and later, in rebuttal, called a former employer of Anson, a fellow engineer technician I, and the senior certified engineering technician who was Anson's new supervisor for a very short time prior to the termination.

¶5. Anson called his immediate supervisor, three present and former MDOT employees, the district materials engineer who was Anson's actual "boss", a senior certified engineering technician, Anson, and his wife, Mary.

¶6. Dobson testified about Anson's occasional "ranting and raving" remarks about people at work, his telephone calls to her home and accusations that she and Doris were "playing footsey" and that he needed to know "if I got one bitches [sic] or two bitches to fight." She further testified that after these incidents she was scared, she wanted to get along with Gary, didn't want to hurt him, and didn't want to file a grievance against him, until he "brought this to my home not once but twice." Additionally, she testified that the incidents caused her to experience health problems including high blood pressure, stress, and anxiety.

¶7. Davis, the other complainant, testified about Anson's rude and sometimes threatening attitude toward her beginning in May and June of 2000, and continuing through January 2001, during which time he pointed his finger in her face and called her a "witch from hell", warned her to "stay out of his business," "watch her back," and "never show her face," while she was at work at the Gulf Coast site. Davis further testified she had been scared to report Anson's behavior previously because she was afraid he would kill her.

¶8.     Not surprisingly,  Anson, Dobson and Davis cast the allegations of the complaints in entirely different lights. Anson said, in essence, that  the allegations were about simple isolated happenings where he might have been rude, or angry but never threatening or inappropriate.  The complainants said, in essence, that the allegations were  about real threats, inappropriate language, extreme anger, and on-going confrontations, resulting in fear, emotional distress and even detrimental effects on health. The other witnesses, for both sides,  testified that Anson had a quick temper and had often challenged co-workers and higher level management regarding his failure to get promotions and made accusations that jobs were being given to friends and relatives of people in higher positions at MDOT.  He characterized himself as a whistle blower and maintained that his termination was done in retaliation for his challenges to the decisions of management.

¶9.      Hearing officer Smith found that "[a]lthough Mr. Anson did in fact violate the agency and the State's policy...this Court finds that all parties would be better served" by: (1) transferring Anson to a like position in Tupelo as a probationary employee for one year; (2) keeping the EAB order completely confidential; (3) reinstating Anson but not awarding leave and back pay for the period he did not work; (4) having Anson's personnel file not reflect any termination or disciplinary action; and (5) prohibiting Anson from contacting any District 6 MDOT employees during working hours.

¶10.    Both Anson and MDOT appealed that decision of the hearing officer to the full board.  The EAB, after reviewing the transcript, record, documentary evidence and briefs, overruled the hearing officer's decision and affirmed MDOT's dismissal of Anson, finding the following: (1) Anson had not sustained his required burden of proof and (2) MDOT followed the published rules and regulations of the State Personnel Board in terminating Anson from his position.

¶11. Anson then appealed to the Forrest County Circuit Court, which reversed the EAB's affirmance of Anson's termination, finding it unsupported by substantial evidence, arbitrary and capricious, violative of constitutional rights, and beyond the scope of the power granted the agency. The Mississippi Transportation Commission timely appealed to this Court.

## ANALYSIS

¶12. The existence within government of discrete areas of quasi-legislative, quasi-executive, quasi-judicial regulatory activity in need of expertise is the raison d'etre of the administrative agency. *McGowan v. Miss. State Oil & Gas Bd.*, 604 So.2d 312, 323 (Miss. 1992). Because of their expertise and the faith we vest in it, we limit our scope of judicial review. *Id. See also Grant Ctr. Hosp. of Miss., Inc. v. Health Group of Jackson, Miss., Inc.*, 528 So.2d 804, 810 (Miss. 1988). It is the well-settled precedent of this Court that the standard of review governing an appeal from a decision of an administrative agency is that of substantial evidence. *Walters v. Miss. Dep't of Econ. & Cmty. Dev.*, 768 So.2d 893, 895 (Miss. 2000) (citing *Holloway v. Prassell Enters., Inc.* 348 So.2d 771, 773 (Miss. 1977)). If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious. *Pub. Employees' Ret. Sys. v. Marquez*, 774 So.2d 421, 425 (Miss. 2000).

¶13. The statutory scope of judicial review of employee appeals board decisions is found in Miss. Code Ann. § 25-9-132 (Rev. 2003), which states in pertinent part:

> (2) The scope of review of the circuit court in such cases shall be limited to review of the record made before the employee appeals board or hearing officer to determine if the action of the employee appeals board is unlawful for the reason that it was:
> (a) Not supported by substantial evidence;
> (b) Arbitrary or capricious; or
> (c) In violation of some statutory or constitutional right of the employee.

5

These factors which govern the standard of review for agency decisions are the only grounds for overturning an agency's action; otherwise the agency's determination must remain undisturbed. *Walters*, 768 So.2d at 897; *Miss. Dep't of Envtl. Quality v. Weems*, 653 So.2d 266, 273 (Miss. 1995). This Court must often determine whether a circuit court has exceeded its authority in overturning an agency action, and we proceed aware that "a rebuttable presumption exists in favor of the action of the agency, and the burden of proof is on the party challenging an agency's action." *Publ. Employees' Ret. Sys. v. Shurden*, 822 So.2d 258, 263 (Miss. 2002); *Pub. Employees' Ret. Sys. v. Dishmon*, 797 So.2d 888, 893 (Miss. 2001). Where that authority has been exceeded, this Court will not hesitate to reverse and reinstate the agency's order. *Miss. Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors*, 621 So.2d 1211, 1215 (Miss. 1993).

## I. WAS THE EAB'S DECISION SUPPORTED BY SUBSTANTIAL EVIDENCE?

¶14. Substantial evidence is not such a malleable term of art that it may escape definition. Indeed, we have defined substantial evidence as evidence that a reasonable person would accept as adequate to support a conclusion. *Tucker v. Prisock,* 791 So.2d 190, 192 (Miss. 2001). It is "something more than a 'mere scintilla' or suspicion." *Marquez*, 774 So.2d at 425.

¶15. In the present case, there was evidence of on-going hostility and veiled threats by Anson, as previously discussed. A reasonable person could accept Anson's admission that he pointed his finger at Davis and told her to "stay out of his business" as well as Davis's testimony that Anson warned her to "watch her back" and "never show her face," together with the other testimony presented in the EAB hearing, as adequate to support the conclusion that he threatened Davis. Moreover, a reasonable person could accept Anson's admission that he called Dobson's home and used "bad language" together with

6

Dobson's testimony that Anson said "I need to know whether I'm fighting one of y'all or both of y'all" together with the other testimony given before the EAB as adequate evidence of Anson's violation of the rules set forth in the Mississippi State Employee Handbook.

¶16. The EAB was correct in its determination that there was sufficient evidence of Anson's "threatening or coercing employees" and/or engaging in "acts of conduct . . . plainly related to job performance . . .of such nature that to continue the employee in the assigned position could constitute negligence in regard to the agency's duties to . . .other state employees..." to warrant dismissal. Corroborating testimony from Anson's own friendly witnesses tended to show his proclivity for anger and isolated violence. The testimony of Davis and Dobson, combined with the testimony of witnesses attesting to Anson's pattern of threatening conduct, is more than a mere scintilla of evidence. The EAB was correct in finding it to be substantial.

## II. WAS THE EAB'S DECISION ARBITRARY OR CAPRICIOUS?

¶17. If an agency's decision is supported by substantial evidence, then it is not arbitrary or capricious. *Miss. Bureau of Narcotics v. Stacy,* 817 So.2d 523, 526 (Miss. 2002). This Court has said that the terms "arbitrary" and "capricious" are "open-textured and not susceptible to precise definition or mechanical application." *Miss. State Dep't of Health v. Southwest Miss. Reg'l Med. Ctr.*, 580 So.2d 1238, 1240 (Miss. 1991). Moreover, an act is capricious when it is "done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles." *Id.* Even a reading of the cold record reveals that both Dobson and Davis perceived Anson's statements and conduct as threatening. The statement "watch your back" in its plainest sense is a threat. Davis and Dobson based their perception of the threats on Anson's attitude toward them at the time of the incident. The EAB is empowered to accept the testimony of one witness, or in this case

7

at least three witnesses, over the testimony of Anson. In this case, the EAB's decision is supported by substantial evidence; therefore, the EAB's decision is not arbitrary or capricious.

### III. DID THE CIRCUIT COURT ERR WHEN IT REWEIGHED THE EVIDENCE AND SUBSTITUTED ITS OWN JUDGMENT FOR THAT OF THE EAB?

¶18. Review of an order from an administrative agency's proceeding is limited to the record and the findings of the agency. *Miss. Employment Sec. Comm'n v. Pulphus*, 538 So.2d 770, 772 (Miss. 1989). It follows that the Court may neither substitute its own judgment for that of administrative agency which rendered the decision nor reweigh the facts of the case. *Publ. Employees' Ret. Sys. v. Shurden*, 822 So.2d at 263.

¶19. In the present case, there is no doubt that the circuit court looked at the factual findings of the EAB not only to determine if they supported the decision, but to reweigh them. With regard to the telephone argument between Anson and Dobson's husband, after stating disagreement with the EAB's findings regarding that argument, the circuit court judgment states "**[w]hat happened was** a telephone argument that apparently escalated to a curse out between both appellant Anson and Mr. Terry Dobson." (emphasis added). With regard to what might be suitable discipline for Anson, the judgment states "Gary Anson might possibly have been in line for a reprimand concerning his conduct on that day, but such remarks were not reprehensible and did not rise to the status of a serious disciplinary violation which would require neither a suspension nor certainly not a termination." Further, the judgment states "[t]his Court finds that the entire rebuttal proof put on by the [MDOT] was designed to defame and discredit Gary B. Anson." The entire tenor of the judgment is one of pointing out what the EAB did wrong and substituting the circuit court's interpretation and understanding of the evidence for the EAB decision.

8

## IV. DID THE EAB'S DECISION VIOLATE ANSON'S FREEDOM OF SPEECH AND FREEDOM OF ASSOCIATION?

¶20. The judgment of the circuit court states that the third reason for reversing the decision of the EAB is that MDOT's January 18, 2001, memorandum to its District Six Lab employees informing them "not to have any communication with [Anson] or give out any information to him that might be detrimental to the MDOT" violates his freedom of speech and freedom of association. However, Anson did not mention any issue regarding this memorandum in his initial appeal to the EAB following his termination.[3] The only mention of it at the EAB hearing was in testimony on direct examination by MDOT's witness Philip Coco. Although Anson's attorney cross-examined Coco as to his intent in writing it and the implications of doing so, nothing further was said about it in the course of the hearing and the EAB hearing officer did not mention it in his order. Anson's petition for appeal filed in the Forrest County Circuit Court summarily references the memorandum as "[a] further indication of the arbitrariness of the Mississippi Department of Transportation, as well as their violation of [Anson's] right to free speech and association . . . which directive speaks for itself but clearly contains a First Amendment as well as a due process violation."

¶21. There is no merit to this issue. The only testimony regarding the memo was given by Philip Coco, MDOT's district personnel director, on direct examination by MDOT's attorney. He explained that he wrote it to centralize the processing of information about Anson's termination and to give MDOT

---

[3] The Notice of Appeal, SPB Form 1020-86, which is the prescribed form for filing all appeals before the EAB, requires a statement of the appealing party of the facts upon which the appeal is taken, and why the grievable action is in error. In his statement, Anson included three paragraphs: the first stating that Dobson's allegations came from a person of no credibility and are false; the second stating that Davis' allegations were taken out of context and blown out of proportion, because no threat was ever made; and the third stating that he believed that the whole matter is retaliation for prior actions he has taken concerning his promotion and his support for other employees' promotions.

This appeal form also requires a list of all documents and exhibits that are attached for consideration, and Anson's list does not include any mention of the January 18 memorandum, nor was it attached to the notice of appeal.

employees an excuse not to have to talk with Anson, since several of them had called to complain that Anson was calling them trying to get information. He further testified that some employees had "actually had their [home] phones blocked from receiving phone calls from Gary... They didn't know if they were being recorded or whatever the case may be.... I discussed it with the District Engineer and told him I was going to send a letter out. And the intent of the letter was to let the employees know if they had any questions, if Gary had called about anything, just direct all the calls to the District Engineer's office or to my office, and we would try to answer it." The memo was written the day after Anson's termination. Even though Coco testified that he should not have worded the memo as he did, and that, in retrospect, he would have reworded it, that issue is not before us.

¶ 22    "Unless the employee carries the burden of persuasion to show . . . that the [disciplinary] action was impermissibly based on . . . the exercise of First Amendment freedoms, the employee has no right to have the employment decision overturned." *Walters*, 768 So.2d at 898. As it pertains to this disciplinary action, Anson's speech was not a cause or even a contributing factor in MDOT's decision to proceed with disciplinary action against him. Although his speech conduct (telephone calls, shouting, cursing, verbal threats) was clearly a large part of the reason of the disciplinary proceeding, that speech was in no way involved in or affected by the January 18 , 2001 memo, which is what the circuit court found to be in "violation of freedom of speech and freedom of association . . . evidenc[ing] conduct which this Court cannot condone." Further, the burden properly rested on Anson, and he did not meet this burden of proof. Therefore, the EAB's decision does not violate Anson's constitutional rights.

10

## CONCLUSION

¶23. For these reasons, we reverse the circuit court's judgment, and we render judgment here reinstating the EAB's decision affirming MDOT's termination of Gary B. Anson's employment.

¶24. **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER, P.J., AND DICKINSON, J., CONCUR. CARLSON, GRAVES, AND RANDOLPH, JJ., CONCUR IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**